UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JAMES FOXWORTHY,                              )
            Plaintiff,                     )
                                          )
     vs.                                       )          1:05-cv-1803-LJM-WTL
                                          )
KARL BUETOW, WILLIAM HOLLAND,                 )
PAUL ALLEN, JIM WEBB AND BARBARA             )
THOMPSON, individually and as members of     )
the West Central Conservancy District Board of )
Directors, and WEST CENTRAL                   )
CONSERVANCY DISTRICT,                         )
            Defendants.                    )

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff, James Foxworthy ("Foxworthy"), filed this action under 42 U.S.C. § 1983 against Karl Buetow ("Buetow"), individually and as a member of the West Central Conservancy District Board of Directors', and West Central Conservancy District ("WCCD") (collectively, "Defendants").[1]  Foxworthy also filed a claim against Defandants for defamation.  This matter comes before the Court on Defendants' Motion for Summary Judgment.  For the reasons stated herein, the Court **DENIES in part and GRANTS in part** Defendants' Motion for Summary Judgment.

**I. BACKGROUND**

WCCD is a political subdivision of the State of Indiana and is a duly formed conservancy district established by the Hendricks Circuit Court, pursuant to Indiana Code § 14-33-1 *et seq.*  Goff

---

[1]Plaintiff Foxworthy has dismissed with prejudice his claims against William Holland, Paul Allen, Jim Webb, and Barbara Thompson.  As such, the claims against these former defendants are not discussed in this order.

Aff. at ¶ 3.  WCCD provides sewer service to its customers in Hendricks County, Indiana.  Goff.

Dep. at 5.  Buetow is, and at all times related to this lawsuit has been, Chairman of the Board of

Directors for WCCD.  Buetow Dep. at 11.

Foxworthy resides in Avon, Hendricks County, Indiana.  Foxworthy Dep. at 10.  In 2005,

Foxworthy began looking for ways to save money and he believed that the $45.00 flat rate he paid

WCCD for sewer service was too high and unfair.  *Id.* at 61-62.  Foxworthy prepared a petition in

opposition to the $45.00 flat rate and circulated it throughout his neighborhood.  *Id.* at 58, 63.

Foxworthy attended a meeting of the Avon Town Board (the "Board") in late summer, 2005,

after gathering approximately a hundred signatures and requested its support for his petition in

opposition to the sewer rate.  *Id.* at 59-60; Yackey Dep. at 12.  The Board decided to support

Foxworthy's petition.  Foxworthy Dep. at 60; Yackey Dep. at 13.  The Board also had a petition it

wished to circulate that opposed an effort by WCCD to expand its approved purposes to provide

water supply.  Foxworthy Dep. at 76;  Yackey Dep. at 14-15.  The Board asked Foxworthy to

circulate its petition while he circulated his own and Foxworthy agreed.  Foxworthy Dep. at 60-61.

Foxworthy subsequently circulated the Board's petition.  *Id.* at 71.

An article was published in the *Indianapolis Star* on August 27, 2005, that described

Foxworthy's petition drive and his goals.  Goff Aff. ¶ 8; Goff Aff. Ex. 1.  This article is what brought

Foxworthy's petition drive to Ron Goff's ("Goff") attention.  Goff Aff. ¶ 8.  Goff is the manager of

WCCD.  *Id.* at ¶ 2.

On September 19, 2005, Donna Prough ("Prough") called WCCD and talked with Debra K.

Sillery ("Sillery"), the assistant manager of WCCD.  Sillery Aff. ¶ 2-3.  Prough reported that a

petition was brought to her home by a woman on September 17, 2005, and that the carrier informed

her that the district was going to raise its sewer rates. *Id.* at ¶ 3. Prough also stated that the carrier told her that signing the petition would prevent increases in rates. *Id.* Following this conversation, Sillery informed her immediate supervisor, Goff. *Id.* at ¶ 4; Goff Dep. at 23, 24. Drawing all reasonable inferences in favor of Foxworthy, Foxworthy neither knew that petitions were circulated in Prough's neighborhood, nor knew about Prough's signed petition page. *See* Foxworthy Dep. at 175-76. Foxworthy claimed that he never discovered who presented the petition to Prough. Foxworthy Dep. at 80.

On approximately September 19, 2005, Foxworthy visited the WCCD office to submit a freedom of information request regarding a WCCD board member's wife's paid participation in a petition drive sponsored by WCCD. Goff Dep. at 37; Foxworthy Dep. at 120-21.

After Goff received the information from Sillery regarding Prough's complaint and after Foxworthy's freedom of information request, Goff contacted Buetow and counsel, Alan Hux ("Hux"). *Id.* at 52. Goff subsequently drafted an advertisement, which was submitted for review to Buetow and Hux, and it was decided that the advertisement would be placed in the *Indianapolis Star*. *Id.* at 52-53. Goff, Buetow, and Hux also decided to run the advertisement twice because they wanted the information to be available to the public. *Id.* at 72-73. The advertisement cost WCCD $3,824.00. *Id.* at 75.

About two days before the advertisement ran, Foxworthy returned to the WCCD office to pick up the documents he requested. *Id.* at 37. Goff informed Foxworthy of Prough's complaint and that "somebody was out there saying mean things" about WCCD. Foxworthy Dep. 79. Goff acknowledged that the complaint was not about Foxworthy, but another petition carrier. *Id.*

Foxworthy told Goff he did not want to provide incorrect information to petition signees and that

he did not approve of or agree with pressuring elderly citizens.  *Id.* 44-45.

On September 24 and 27, 2005, the advertisement was published in the *Indianapolis Star*,

Hendricks A.M. Section.  Goff Dep. at 85-86.  The relevant portions of the advertisement read:

> As a result of being contacted by a customer of the [WCCD] concerned about information given to her on Saturday, September 17, 2005, by an individual soliciting a signature on a petition in opposition to [WCCD's] efforts to add to its purpose, the [WCCD] feels obligated to inform our customers and freeholders of untrue statements made in the petition drive.

> An elderly lady, a homeowner, in Stone Mill Subdivision was approached by a female carrying a petition, stating the petition was to stop [WCCD] from raising sewer rates.  The homeowner stated that the petition carrier stated very "mean things" about [WCCD] and continued to say that [WCCD] was going to raise the rates for sewer and this petition was the only way "they" were going to be able to stop the increase.  The homeowner did not sign the petition and, because of the conduct of the individual, contracted [WCCD] to report the incident.

> \* \* \*

> For Mr. Foxworthy and his associates to obtain signatures that will be used for purposes other than what is communicated to the public and to misrepresent the intentions of [WCCD] by stating [WCCD] is going to raise rates, when, in fact, they know otherwise to create [sic] stress and worry on the elderly residents of this community  is reprehensible. Misstatement of facts, pressuring the elderly, and simple false pretense of his mission is, at the least, dishonest, self serving, and unethical. The practice outlined above should stop immediately.

> Future comments made to the public about [WCCD] that are false and/or slanderous in nature to the [WCCD] and/or the Board of Directors and that place in jeopardy our customer relationships will be dealt with to the full extent permitted by law.

Foxworthy Dep. Ex. 2.

Foxworthy first saw the advertisement following an Avon town festival.  Foxworthy Dep.

at 90.  At the festival, various persons mentioned the advertisement to Foxworthy, who was at the

festival to collect signatures for his petitions, but Foxworthy did not understand what they were talking about. *Id.* at 90-91.  One gentleman approached Foxworthy and said he wanted to help Foxworthy, but he thought Foxworthy was going to get in trouble so the gentlman would not help now. *Id.* at 92.  No other person said anything negative about Foxworthy or his reputation at the festival. *Id.* at 92-93.

Upon actually reading the advertisement, Foxworthy's reaction was anger at "being called all these things that it says that are untrue." *Id.* at 117.  Foxworthy admitted that his actions where self-serving, because he was trying to lower his sewer rate, but he also felt that he was serving others in his petitions. *Id.* at 117-118.  Foxworthy felt threatened by the last paragraph in the advertisement. *Id.* at 124-25.   In his deposition. Foxworthy could not recall whether he walked around a neighborhood with the petition after the advertisement was published. *Id.* at 127.  In his affidavit, which postdates his deposition, Foxworthy stated that he did curtail his "canvassing of neighborhoods to gather signatures." Foxworthy Aff. ¶11.  Foxworthy also stated that he continued to oppose WCCD's rates and its request to expand its purpose only with great concern that WCCD would follow through on the threats in the advertisement. *Id.* at  ¶ 10.  Foxworthy claims that the advertisement contributed to his decision to resign from his position on the Avon Police Merit Board. *Id.* at ¶ 13.  Foxworthy claims that the thought of people believing the advertisement and believing that he harassed or intimidated the elderly caused him worry, stress, and many sleepless nights. *Id.* at ¶ 8.  The threat of legal action or further "personal attacks in the newspaper or elsewhere" has also caused stress and embarrassment and contributed to many sleepless nights. *Id.* at ¶10.

After the advertisement was published, Foxworthy sent a letter to an Avon resident objecting to the sewer rate and requesting help in circulating petitions. *Id.* at 146; Foxworthy Dep. Ex. 6. Foxworthy admitted that nothing in the advertisement prevented, harassed, or intimidated him to the point where he could not send this letter. Foxworthy Dep. 147-48. After the advertisement was published, Foxworthy also filed an objection to WCCD's petition that was pending before the Hendricks Circuit Court. *Id.* at 130. Foxworthy also worked to replace members of WCCD's Board of Directors after the advertisement and actively campaigned for a candidate opposing a then-current WCCD Board of Directors member. *Id.* at 131.

## II. SUMMARY JUDGMENT STANDARD

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). *See also United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267-68 (7th Cir. 1990). Motions for summary judgment are governed by Federal Rule of Civil Procedure 56 (c) ("Rule 56(c)"), which provides in relevant part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials which "set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). A genuine issue

of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 997 (7th Cir. 1996). It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which she relies. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). When the moving party has met the standard of Rule 56, summary judgment is mandatory. *See Celotex*, 477 U.S. at 322-23; *Shields Enters., Inc. v. First Chi. Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992).

In evaluating a motion for summary judgment, the Court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson*, 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir. 1996). Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996).

# III. DISCUSSION

## A. FIRST AMENDMENT CLAIMS

Section 1983 provides a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and law" by any person acting "under color of any statute, ordinance, regulation, custom, or usage, or any State or Territory."   42 U.S.C. § 1983.   Thus, a plaintiff must "allege that a government official, acting under color of state law, deprived them of a right secured by the Constitution or laws of the United States." *Christensen v. County. of Boone,* 483 F.3d 454, 459 (7th Cir. 2007).   Foxworthy claims that WCCD acted under color of state law because it is a political subdivision of the State of Indiana.  This is undisputed by WCCD.  Def.'s Am. Ans. to Compl.   ¶ 7.   As to the second element, Foxworthy claims that his First Amendment rights were violated when Defendants published the advertisement in retaliation of the exercise of those rights.

## 1. Elements of a § 1983 Retaliatory Action Against a Non-Employer

The well-known *Pickering* balancing test is used to evaluate retaliation claims when a plaintiff is an employee of the government.  *Pickering v. Board of Education*, 391 U.S. 563 (1968). Courts have applied the *Pickering* balancing test outside the employment setting, but "those decisions have typically involved some kind of contractual relationship between the plaintiff and the defendant." *Worrell v. Henry*, 219 F.3d 1197, 1210 (10th Cir. 2000).  There is no allegation of such an employment contract in this case.  The Supreme Court has explained the special interests involved when the government is the employer:

> The key to First Amendment analysis of government employment decisions, then, is this: The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer. The government cannot restrict the speech of the public at large just in the name of efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate.

*Waters v. Churchill*, 511 U.S. 661, 675 (1994). This explanation implies that there are different interests at stake in a § 1983 retaliation action that do not concern a government employment situation. As such, a different analysis must be used.

Neither the U. S. Supreme Court nor the Seventh Circuit has squarely addressed the proper standard for such cases. However, the Tenth Circuit outlines such an analysis in *Worrell*. There, the Tenth Circuit adopted a three element test:

> (1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.

*Worrell*, 219 F.3d at 1212. In adopting this approach, the Tenth Circuit explained that "[b]y focusing on the protected activity, the effect of the defendant's actions, and the defendant's intent, this approach reduces the risk of infringement that might result from application of the *Pickering* balancing." *Id.* at 1213. The Tenth Circuit also noted that "it is the government's powers and responsibilities as an employer that warrant restrictions on speech that would not be justified in other contexts." *Id.* at 1210.

The Sixth and Fifth Circuits have also adopted this approach to retaliation claims involving non-employer defendants. *See Bloch v. Ribar,* 156 F.3d 673, 678 (6th Cir. 1998); *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002). This Court has also used this approach for this type of claim. *See*

9

*Edlin v. Veolia Water Indianapolis, LLC*, Cause No. 1:05-cv-1063-LJM-WTL, 2005 WL 2886041, at *2 (S.D. Ind. Nov. 2, 2005).  The Court will use this test to evaluate Foxworthy's First Amendment retaliation claim because it agrees with the Tenth Circuit that this test reduces the risk of infringement on First Amendment rights that might result from application of the *Pickering* balancing test to an ordinary citizen's speech.

With respect to the first element, it is undisputed that Foxworthy was engaged in a constitutionally protected activity when he circulated his petitions.  However, as to the second element, the parties dispute whether Foxworthy has evidenced that WCCD's actions caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity.

WCCD claims that because Foxworthy continued to exercise his First Amendment rights unimpeded after the advertisement was published, WCCD is entitled to summary judgment.  But, the fact that Foxworthy continued exercising his First Amendment rights, alone, is not enough to prevent Foxworthy from meeting the second element.  The standard for this element is what  "a person of ordinary firmness" would do.  This is because "it would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity." *Smith v. Plati*, 258 F.3d 1167, 1177 (10th Cir. 2001).  Thus, there must be no dispute of material fact that a person of ordinary firmness would be chilled from continuing to engage in his protected activity.   Neither party has addressed how to apply this objective standard to the instant case, however, other courts that have dealt with the issue provide some guidance.

In *Smith v. Plati*, the plaintiff maintained a website that included substantial information on the men's and women's athletic teams at the University of Colorado at Boulder. *Smith*, 258 F.3d at 1172. The plaintiff alleged that the defendant had retaliated against him because the plaintiff exercised his First Amendment rights in maintaining the website. *Id.* at 1173. Specifically, the plaintiff alleged, *inter alia*, that the defendant prevented him from talking to coaches, excluded him from football practices, and denied him access to resources of the athletic department routinely given to other media and fans. *Id.* at 1172. The *Smith* court found that the plaintiff's claim failed to prove the second element. The court explained that the defendant's "actions may have made it more difficult to obtain some information regarding the University's varsity athletic programs, but alternative avenues to information remained open. In addition, [the defendant] did nothing to affect an ordinary person's ability to actually maintain a website." *Id.* at 1177. The *Smith* court then concluded that "[plaintiff's] persistence in maintaining his website offers some evidence that [defendant's] actions did not prevent such private speech" and affirmed the district court's decision to dismiss the claim. *Id.*

In *McCormick v. City of Lawrence*, Cause No. Civ. A. 03-2418-KHV, 2006 WL 334658 (D. Kan. Feb. 13, 2006), the defendants claimed that the plaintiff could not show the defendants' actions caused him an injury that would chill a person of ordinary firmness from continuing to engage in that activity because the plaintiff continued his activity. *Id.* at *5. The *McCormick* court decided that it could not "conclude as a matter of law that an officer's threat to arrest and repeated physical 'bumping' in the chest would not chill a person of ordinary firmness from continuing to engage in protected activity." *Id.*

11

Using these two cases as a guide, the Court cannot conclude as a matter of law that a person of ordinary firmness would not desist in his protected activity under the circumstances presented in this case.  In *Smith*, the defendant only made it more difficult for the plaintiff to access information. That is not the case here.  A quarter-page advertisement, published twice, in a newspaper read by thousands of people is a significant warning at the least, if not a threat.  The Court concludes that a reasonable factfinder could decide that a person of ordinary firmness would have been deterred in his protected activity in the face of threatened litigation, subsequent public warnings, and accusations of reprehensible conduct.

To survive summary judgment, Foxworthy must also show that WCCD's adverse action was substantially motivated by Foxworthy's exercise of constitutionally protected conduct.  This element cannot be seriously disputed by WCCD.  If WCCD had not been aware that Foxworthy was circulating petitions, it would not have included his name in the advertisement.  The record shows that WCCD was aware of Foxworthy's petition drive before the publication of the advertisement. Goff, the manager of WCCD, attested that he became aware of Foxworthy's petition drive on August 27, 2005, when an article describing Foxworthy's efforts was published in the *Indianapolis Star*. Goff Aff. ¶ 8.  This was almost a month before the publication of the advertisement on September 24 and 27, 2005.  Awareness of Foxworthy's petition drive is the only possible motive for including Foxworthy's name in advertisement.  On these facts, a reasonable factfinder could conclude that WCCD was substantially motivated by Foxworthy's exercise of constitutionally protected conduct when it published the advertisement.

12

## 2. <u>Qualified Immunity</u>

WCCD claims that it is entitled to qualified immunity on Foxworthy's First Amendment retaliation claim.  Specifically, WCCD claims that Foxworthy cannot show that WCCD violated a clearly established right.

To evaluate a claim of qualified immunity, the Court must "first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne*, 526 U.S. 603, 609 (1999).  The Court has determined that Foxworthy has alleged the deprivation of an actual constitutional right, and now must decide whether that right was clearly established at the time of the violation.

WCCD claims it is entitled to qualified immunity because Foxworthy did not cite any decision by the Supreme Court or the Seventh Circuit Court of Appeals outside of the public-employment context and thus, a citizen's right to be free from retaliatory action for exercising his First Amendment rights has not been long or clearly established.  The Court admits that Foxworthy did not cite any decisions from the U.S. Supreme Court or the Seventh Circuit outside of the public-employment context.  However, the Seventh Circuit has stated that "[i]n the absence of controlling precedent, we broaden our survey to include all relevant caselaw in order to determine 'whether there was such a clear trend in the caselaw that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time.'" *Denius v. Dunlap*, 209 F.3d 944, 951 (7th Cir. 2000) (quoting *Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 430 (7th Cir. 1989)).  Here there is such a clear trend in the caselaw and it appears that it will only be a matter of time before the recognition of the right will be governed by controlling precedent.

13

Foxworthy cites two cases from the Sixth Circuit that are outside of the public employment context.  In *Barrett v. Harrington*, 130 F.3d 246 (6th Cir. 1997), a citizen gathered information about a judge from various public sources in order to oppose the judge's future political endeavors.  *Id.* at 262.   The judge subsequently informed the media that the citizen was stalking her.   While considering whether the judge was entitled to qualified immunity on the First Amendment retaliatory claim, the Sixth Circuit stated that "it is well-established that a public official's retaliation against an individual exercising his or her First Amendment rights is a violation of § 1983."  *Id.* at 264.  The *Barrett* court then held that the judge's "statements to the press fail the objective legal reasonableness test because her conduct violated clearly established First Amendment rights."  *Id. See also Schmidt v. Lincoln County*, 249 F. Supp. 2d 1124, 1137 (W.D. Wis. 2003) (citing *Barrett* with approval).

In *Bloch v. Ribar*, 156 F.3d 673 (6th Cir. 1998), one of the plaintiffs was a victim of rape. *Id.* at 676.   After reporting the rape to the local sheriff's department, and after eighteen months without progress in the investigation, the plaintiffs, the rape victim and her husband, spoke to a local newspaper.  *Id.*  The newspaper published an article, followed by other articles in another newspaper, that was critical of the sheriff's department and the sheriff personally.  *Id.*  After the articles were published, the sheriff held a press conference and allegedly "released 'highly personal and extremely humiliating details' of the rape suffered by [the plaintiff]."  *Id.*  The plaintiffs brought a claim under § 1983 that alleged that the defendant "retaliated against them for exercising their [F]irst [A]mendment right to criticize public officials."  *Id.*  When addressing defendant's claim for qualified immunity, the Sixth Circuit held that defendant "is not entitled to qualified immunity from

14

the [plaintiffs'] retaliation claim because the right to criticize public officials is clearly established." *Id.* at 683.

Several other circuits have found the same clearly established right in public-employment contexts. *See, e.g., Trulock v. Freeh*, 275 F.3d 391, 404 (4th Cir. 2001) ("The First Amendment guarantees an individual the right to speak freely, including the right to criticize the government and government officials. To protect that right, public officials are prohibited from retaliating against individuals who criticize them."); *Pendleton v. St. Louis County*, 178 F.3d 1007, 1011 (8th Cir. 1999) ("This [c]ourt repeatedly has held that retaliation against the exercise of First Amendment rights is a basis for section 1983 liability."); *Dobosz v. Walsh*, 892 F.2d 1135, 1141-42 (2nd Cir. 1989) (stating that "the proscription of retaliation for a plaintiff's exercise of First Amendment rights had long been established"). Although these cases were decided in the public-employment context, they are useful in determining whether the freedom from retaliatory action for exercising one's First Amendment rights is clearly established. As quoted above, "[t]he government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." *Waters*, 511 U.S. at 675. This Court interprets this to mean that when the government is an employer, it has more flexibility in restricting First Amendment rights than it does when it is not an employer. Non-employees, or ordinary citizens, then, should at least have the same rights and protections as government employees. Therefore, if, in the public-employment context, there is a clearly established right to be free from retaliatory action when a man exercises his First Amendment rights, then "ordinary citizens" perforce have at least the same right and it is clearly established for them as well.

WCCD violated a clearly established right if it retaliated against Foxworthy because of his petition drive.  WCCD is thus not entitled to qualified immunity and the Court cannot grant its motion for summary judgment on this ground.

### 3. Application of Government Speech Doctrine

WCCD claims that under the government speech doctrine, the publication of the advertisement does not implicate Foxworthy's  constitutional rights.  Foxworthy claims that the government speech doctrine is only applicable to forced support of speech or mandated speech and is not applicable to defamation, threatening speech, or any other issue before the Court.

In *Rust v. Sullivan*, 500 U.S. 173 (1991), the Supreme Court first applied the government speech doctrine, albeit not naming it as such.  In *Rust*, the plaintiffs challenged a set of regulations that prevented Title X health providers from, *inter alia*, providing counseling on abortion as a method of family planning or referring patients to abortion providers. *Id.* at 179-181.  The plaintiffs claimed that these regulations violated the First and Fifth Amendment rights of Title X clients and the First Amendment rights of Title X health providers. *Id.* at 181.  The Court stated that "[t]he Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way." *Id.* at 193.  The Court held that "[t]he regulations are a permissible construction of Title X and do not violate either the First or Fifth Amendments to the Constitution." *Id.* at 203.

The Supreme Court subsequently expanded this newly-developed doctrine in *Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819 (1995).  Students at the University of

16

Virginia founded a Christian newspaper and, pursuant to University policy, applied for funding to pay a third-party contractor that printed the newspaper.  *Id.* at 827.  The University denied funding on the basis that the newspaper was a "religious activity" and according to University policy, this excluded the newspaper from having funds disbursed to its contractors.  *Id.*  The University, depending in part on *Rust*, argued that content-based funding decisions are both inevitable and lawful.  *Id.* at 832.  The Court determined that while it is true that

> when the State is the speaker, it may make content-based choices . . . and we have permitted the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message . . . .  It does not follow that viewpoint-based restrictions are proper when the University does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers.

*Id.* at 833-34.  The Court found determinative that the issue at stake did not concern the University's speech, but the speech of private speakers.  *Id.* at 834.

In *Legal Services Corp. v. Velaquez*, 531 U.S. 533 (2001), the Supreme Court again addressed this new doctrine and identified *Rust* as its foundational case.  The Court explained that "[t]he Court in *Rust* did not place explicit reliance on the rationale that the counseling activities of the doctors under Title X amounted to governmental speech; when interpreting the holding in later cases, however, we have explained *Rust* on this understanding."  *Id.* at 541.  *Legal Services* concerned the Legal Services Corporation Act which distributed funds to local organizations to provide financial support for legal assistance.  *Id.* at 536.  The lawsuit challenged a restriction that prohibited legal representation funded by Legal Services if the representation involved an effort to challenge existing welfare law.  *Id.* at 537.  The Court explained that "[w]e have said that viewpoint-based funding decisions can be sustained in instances in which the government is itself the speaker,

or instances, like *Rust*, in which the government 'used private speakers to transmit specific information pertaining to its own program.'" *Id.* at 541 (citations omitted).  However, the Court distinguished this case from *Rust* by explaining that "[t]he advice from the attorney to the client and advocacy by the attorney to the courts cannot be classified as governmental speech even under a generous understanding of the concept" and found the restriction invalid.  *Id.* at 543-44, 549.

Most recently, the Supreme Court addressed government speech in *Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550 (2005).  In this case, the plaintiffs challenged under the First Amendment the manner in which they were forced to fund the "Beef. It's What's for Dinner." advertising campaign.  *Id.* at 554-56.  Although the Court noted that it has "generally assumed, though not yet squarely held, that compelled funding of government speech does not raise First Amendment concerns[,]" *id.* at 599, the Court determined that "[t]he message of the promotional campaign[ ] is effectively controlled by the Federal Government itself." *Id.* at 560.  The Court also explained that "[c]itizens may challenge compelled support of private speech, but have no First Amendment right not to fund government speech." *Id.* at 562.  The *Johanns* Court found in favor of the government, explaining that when "the government sets the overall message to be communicated and approves every word that is disseminated, it is not precluded from relying on the government-speech doctrine merely because it solicits assistance from nongovernmental sources in developing specific messages." *Id.*

The contours of the government speech doctrine gleaned from these Supreme Court cases is fragmented at best.  Citizens do not have a First Amendment right to not fund government speech. *See Johanns*, 544 U.S. at 562.  The government can place restrictions on free speech when providing funding to supports its own policies.  *See Rust*, 500 U.S. at 193.  However, this license to place

restrictions does not extend indefinitely, as the Supreme Court found in *Legal Services* when it struck down the restriction preventing attorneys from competently advocating for their clients. Clearly, as the Fourth Circuit notes, "the 'government speech' doctrine is still in its formative stages, and, as yet, it is neither extensively nor finely developed." *Sons of Confederate Veterans, Inc. v. Comm'r of the Va. Dept. of Motor Vehicles,* 305 F.3d 241, 245 (4th Cir. 2002). As a working definition, this Court concludes that the government speech doctrine recognizes that the government can make its opinion known and can use public funds to disseminate that opinion. The government speech doctrine allows the government to make content-based decisions about its own speech or speech that it funds rather than require the government to only fund viewpoint-neutral speech. The government speech doctrine may also be invoked when the government's message is disseminated through private entities when those entities receive government funding.

What is clear is that neither the Supreme Court nor any of the Courts of Appeals have applied the newly-developed government speech doctrine to government speech made in retaliation to a citizen's exercise of his First Amendment rights. This Court declines WCCD's invitation to extend the doctrine to immunize WCCD's speech from a First Amendment retaliation claim. This decision is based not only on the Court's understanding of the current state of the government speech doctrine, but also on a common sense understanding of First Amendment rights, which are heavily protected. If the government speech doctrine immunized the government when it spoke in retaliation to a citizen's exercise of his First Amendment rights, § 1983 would be severely undercut. The Court does not believe that the Supreme Court intended that the government speech doctrine be applied in such a sweeping manner. As such, the government speech doctrine is not applicable to WCCD's speech and does not dispose of Foxworthy's First Amendment claim on summary judgment.

19

## B. DEFAMATION CLAIM

Foxworthy claims that the advertisement published by WCCD contained false and defamatory statements against him.   Foxworthy further claims that the false and defamatory statements were made with knowledge of falsity or with reckless disregard as to whether the statements were true or false.   In his complaint, Foxworthy labels the statements as defamatory *per se* and claims damages to his reputation, mental anguish, and emotional distress.

Under Indiana law, the elements of defamation are (1) a communication with defamatory imputation, (2) malice, (3) publication, and (4) damages.   *Trail v. Boys & Girls Clubs of Nw. Ind.*, 845 N.E.2d 130, 136 (Ind. 2006).   For a statement to be actionable for defamation, it "must not only be defamatory in nature, but false."   *Id.*   A "communication is defamatory [*per se*] if it imputes: (1) criminal conduct; (2) loathsome disease; (3) misconduct in a person's trade, profession, office, or occupation; or (4) sexual misconduct."   *Hamilton v. Prewett*, 860 N.E.2d 1234, 1243 (Ind. Ct. App. 2007) (citing *Lovings v. Thomas*, 805 N.E.2d 442, 447 (Ind. Ct. App. 2004)).   If the communication is defamatory *per se*, "damages are presumed even without proof of actual harm to plaintiff's reputation."   *Id.*   If the communication is not of one of the above listed categories, the communication is at most defamatory *per quod*.   *See Rambo v. Cohen*, 587 N.E.2d 140, 146 (Ind. Ct. App. 1992).   If a communication is defamatory *per quod*, it "is actionable, if at all, only if it causes the plaintiff special damages."   *Id.* (citing Restatement (Second) of Torts § 575 (1977) (the "Restatement")).   The Restatement defines special harm as "the loss of something having economic or pecuniary value."   Restatement § 575 cmt. b.   "Emotional and physical harms are not special damages unto themselves, but rather are parasitic damages, viable only when attached to normal (i.e. pecuniary) special damages."   *Rambo*, 587 N.E.2d at 146.

Although in his Complaint Foxworthy claims the statements in the advertisement are defamatory *per se*, he did not present any support for this claim in his brief. The Court fails to see how the statements made in the advertisement could be viewed as imputing criminal conduct; loathsome disease; misconduct in Foxworthy's trade, profession, office, or occupation; or sexual misconduct. A reasonable factfinder could not conclude that these statements are defamatory *per se*.

Foxworthy's defamation claim could still survive summary judgment under the defamatory *per quod* approach. Assuming, *arguendo*, that Foxworthy has made a sufficient showing that the communication had defamatory imputation, malice, and publication, Foxworthy's defamation claim fails because no reasonable jury could find that he has alleged and proved special damages.

In Foxworthy's Complaint, the only damages he alleges for his defamation claim are damages to his reputation, mental anguish, and emotional distress. This is not a showing of special damages. Special damages are pecuniary in nature. They "are not assumed to be necessary or inevitable but must be shown by allegation and specific proof to have been actually incurred as a natural and proximate consequence of the wrongful act." *Lovings v. Thomas*, 805 N.E.2d 442, 448 (Ind. Ct. App. 2004) (citing *Levee v. Beeching,* 729 N.E.2d 215, 223 (Ind. Ct. App. 2000)). If Foxworthy had alleged and evidenced special damages, he could have pursued damages for harm to his reputation, mental anguish, and emotional distress. *See Rambo*, 587 N.E.2d at 146. Foxworthy has neither alleged nor evidenced such damages.

Although Indiana courts have required special damages as an element of an action for a defamatory *per quod* statement, Foxworthy urges the Court to consider the Indiana Supreme Court's liberalization of recovery for emotional distress. When considering pendant state claims, the Court

is bound by the law as described by the state courts. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) (citing *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), for the rule that federal courts are bound to apply state law when exercising pendant jurisdiction). The Court will not guess that the Indiana Supreme Court would rule differently in this case and allow a defamation claim to proceed absent evidence of special damages.

Because Foxworthy fails to allege and provide evidence of special damages, the Court grants summary judgment to defendants on Foxworthy's defamation claim.

## C. PUNITIVE DAMAGES

Foxworthy concedes that punitive damages are not recoverable against WCCD. However, Foxworthy claims that punitive damages are recoverable from Buetow.[2]

The Supreme Court has expressly held that "a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). *See also Siebert v. Severino*, 256 F.3d 648, 655 (7th Cir. 2001). Thus, for Foxworthy's punitive damages claim to survive summary judgment, he must show that there is at least a material fact in dispute regarding whether a reasonable factfinder could decide that Buetow was motivated by evil motive or intent or acted in reckless or callous indifference to Foxworthy's federally protected rights.

---

[2]The Court will only address punitive damages as they relate to the § 1983 claim because the defamation claim has already been disposed of by summary judgment.

Although Foxworthy does not once point to the record in his argument for punitive damages, there is evidence that prevents the Court from granting summary judgment. A reasonable factfinder could conclude that Buetow at least acted with callous indifference to Foxworthy's federally protected rights. The fact that Buetow did not contact Foxworthy, or tried to ascertain the identity of the woman Prough complained about before he approved the advertisement for publication, could amount to, at least, callous indifference. For this reason, the Court denies summary judgment on Foxworthy's punitive damages claim.

## IV. CONCLUSION

For the reasons stated herein, defendants', Karl Buetow and West Central Conservancy District, Motion for Summary Judgment is **DENIED in part and GRANTED in part.**

IT IS SO ORDERED this 22nd day of June 2007.

_____
LARRY J. McKINNEY, CHIEF JUDGE
United States District Court
Southern District of Indiana


Electronically Distributed to

Douglas Alan Hoffman
CARSON BOXBERGER
hoffman@carsonboxberger.com

John D. Papageorge
SOMMER BARNARD ATTORNEYS, PC
jpapageorge@sommerbarnard.com

Alan M. Hux
SOMMER BARNARD ATTORNEYS, PC
ahux@sommerbarnard.com

Stephen Milo Terrell
TERRELL LAW OFFICE
terrell@hoosierlawyer.us